UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CAL-PAC RANCHO CORDOVA, LLC, dba PARKWEST CORDOVA CASINO; CAPITOL CASINO, INC.; LODI CARDROOM, INC. dba PARKWEST CASINO LODI; and ROGELIO'S INC., <br><br>Plaintiffs, <br><br>v. <br><br>UNITED STATES DEPARTMENT OF THE INTERIOR; SALLY JEWELL, in her official capacity as Secretary of the Interior; and LAWRENCE S. ROBERTS in his official capacity as Acting Assistant Secretary of the Interior – Indian Affairs, <br><br>Defendants. | No. 2:16-cv-2982-TLN-AC <br><br>**ORDER DENYING PLAINTIFFS' MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD** |

This matter is before the Court pursuant to Plaintiffs Cal-Pac Rancho Cordova, LLC, dba Parkwest Cordova Casino, Capitol Casino, Inc.; Lodi Cardroom, Inc., dba Parkwest Casino Lodi; and Rogelio's Inc.'s (collectively, "Plaintiffs") Motion to Supplement the Administrative Record. (ECF No. 22.) Defendants United States Department of the Interior; Sally Jewell, Secretary of the United States Department of the Interior; and Lawrence S. Roberts, Acting Assistant Secretary-Indian Affairs (collectively, "Defendants") oppose the motion. (ECF No. 23.) Plaintiffs have filed a reply. (ECF No. 24.) For the reasons discussed below, Plaintiffs' motion is DENIED.

1

## I. STATUTORY BACKGROUND

The Indian Reorganization Act ("IRA") provides for the federal protection of Indians and conservation of resources, including Indian land. *See* 25 U.S.C. § 5101, *et seq.* (formerly cited as 25 U.S.C. § 461, *et seq.*). Under this statutory framework, "[t]itle to land acquired by a tribe or tribal corporation . . . may, with the approval of the Secretary of the Interior, be taken by the United States in trust for the tribe or tribal corporation." 25 U.S.C. § 5138 (formerly cited as 25 U.S.C. § 489).

The Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701, *et seq.*, provides the statutory basis for the operation and federal regulation of gaming by Indian tribes. 25 U.S.C. § 2702. This includes tribal gaming ordinances regulating Class II and Class III gaming.[1] 25 U.S.C. § 2710. Under certain circumstances, the Secretary of the Interior, in consultation with the Indian tribe, may prescribe "procedures" or regulations authorizing Class III gaming. 25 U.S.C. § 2710(d)(7)(B)(vii). One such condition is that the gaming must take place on "Indian lands over which the Indian tribe has jurisdiction." 25 U.S.C. § 2710(d)(7)(B)(vii)(II); *see also* 25 U.S.C. § 2710(d)(1), (d)(3)(A). "Under IGRA, the term 'Indian lands' means (A) all lands within any Indian reservation, and (B) land over which an Indian tribe exercises governmental power and that is either (1) held in trust by the United States for the tribe, or (2) held by a tribe or individual subject to restriction by the United States against alienation." *Club One Casino, Inc. v. United States Dep't of Interior*, No. 1:16-cv-01908-AWI-EPG, 2017 WL 5877033, at *4 (E.D. Cal. Nov. 29, 2017) (citing 25 U.S.C. § 2703(4)).

## II. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs are four separate businesses licensed by the state of California, each of which "conduct[] various card and tile games approved by the California Bureau of Gambling Control, including variants of poker, baccarat, blackjack, and other popular table games." (ECF

---

[1] The term "class I gaming" refers to "social games solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals as a part of, or in connection with, tribal ceremonies or celebrations." 25 U.S.C. 2703(6). The term "class II gaming" includes (i) the game of chance commonly known as bingo and (ii) card games that are (I) explicitly authorized by the laws of the State, or (II) not explicitly prohibited and are played at any location in the State, provided that such card games are played in conformity with State laws and regulations (if any) regarding hours or periods of operation of such card games or limitations on wagers or pot sizes in such card games. 25 U.S.C. 2703(7). "Class III gaming" includes all forms of gaming that do not fall into the class I or II categories.

No. 1 ¶¶ 13, 15, 17, 19.) The Estom Yumeka Maidu Tribe of the Enterprise Rancheria is a federally recognized Indian tribe ("the Tribe"). (ECF No. 1 ¶ 24.) While the Tribe was involved in a prior related lawsuit before this Court, *Estom Yumeka Maidu Tribe of the Enterprise Rancheria of California v. State of California*, 163 F. Supp. 3d 769 (E.D. Cal. 2016) ("the Good Faith Lawsuit"), it is not joined in the present litigation. (ECF No. 1 ¶ 24.) However, Defendants can adequately protect the Tribe's interests.[2] (ECF No. 1 ¶ 24.)

The Tribe intends to conduct Class III gaming on a parcel of land in Yuba County ("the Yuba parcel"). (ECF No. 1 ¶ 1.) On August 13, 2002, the Tribe submitted an application to the Bureau of Indian Affairs to have the Yuba parcel taken into trust for the Tribe for the purpose of developing a casino. (ECF No. 1 ¶ 44.) This request was made pursuant to Section 5138 of the IRA. (ECF No. 1 ¶ 44.) At the time of the application, the Yuba parcel was owned by a private business entity. (ECF No. 1 ¶ 44.) On May 16, 2013, the Yuba parcel was transferred to "the United States of America in Trust for the Enterprise Rancheria of Maidu Indians of California." (ECF No. 1 ¶ 46.) The Yuba parcel is located within 75 miles or less of Plaintiffs' cardrooms, and any gaming conducted by Tribe "would be in direct competition with games offered by" Plaintiffs. (ECF No. 1 ¶¶ 13, 15, 17, 19.)

In order to be able to offer Class III gaming, IGRA requires a "Tribal-State compact entered into by the Indian tribe and the State." (ECF No. 1 ¶ 26) (citing 25 U.S.C. § 2710(d)(1)). On August 30, 2012, the Governor of the State of California signed a compact with the Tribe to govern gaming on the Yuba Parcel. (ECF No. 1 ¶ 26.) The compact provided that unless the Tribal-State agreement took effect by July 1, 2014, it would "be deemed null and void unless the Tribe and the State agree in writing to extend the date." (ECF No. 1 ¶ 26.) The California Legislature failed to ratify the compact by the prescribed deadline, and the State and the Tribe did not agree to extend the date. (ECF No. 1 ¶¶ 27–30.) As such, the compact became null and void by its own terms. (ECF No. 1 ¶ 30.)

---

[2] By holding the Yuba parcel in trust for the Tribe, the federal government necessarily represents the Tribe's interests. 25 U.S.C. § 5138 (formerly cited as 25 U.S.C. § 489); *see also* 25 U.S.C. § 5108 (formerly cited as 25 U.S.C. § 465) ("The Secretary of the Interior is authorized, in his discretion, to acquire . . . any interest in lands . . . for the purpose of providing land for Indians.").

Section 2710(d)(7) of IGRA provides for certain procedures in the event a state refuses to negotiate with an Indian tribe for the purpose of entering into a Tribal-State compact or otherwise fails to negotiate in good faith. (ECF No. 1 ¶ 32.) Pursuant to the statute, the Tribe initiated the Good Faith Lawsuit on August 20, 2014, alleging the State's failure to negotiate a compact in good faith. (ECF No. 1 ¶ 33.) This Court held that the Legislature's inaction supported a finding of bad faith and ordered the parties to conclude a compact within 60 days pursuant to Section 2710(d)(7)(B)(iii). (ECF No. 1 ¶ 34; *see also Estom Yumeka Maidu Tribe of the Enterprise Rancheria of California*, 163 F. Supp. at 784–87.) The Tribe and State failed to do so. (ECF No. 1 ¶ 36.)

In the event that no compact is reached within the 60-day window as mandated by the statute, Section 2710(d)(7)(B)(iv) requires each party to submit its "last best offer" to a court-appointed mediator, who must select the proposed compact which best comports with IGRA. (ECF No. 1 ¶ 37.) The mediator found that the Tribe's proposal best comported with IGRA and submitted the compact to the State for consent. (ECF No. 1 ¶ 38.) Because the State failed to consent within the necessary timeframe, the Tribe's proposed compact was then submitted to the Secretary of the U.S. Department of the Interior pursuant to Section 2710(d)(7)(B)(vii). (ECF No. 1 ¶ 39.) On August 12, 2016, Defendants issued a document entitled "Secretarial Procedures" authorizing the Tribe to engage in Class III gaming on the Yuba parcel. (ECF No. 1 ¶ 40.)

On December 21, 2016, Plaintiffs filed a complaint challenging the validity of the Secretarial Procedures issued by Defendants and alleged that the Tribe did not exercise territorial jurisdiction over the Yuba Parcel as required by IGRA. (ECF No. 1.) Plaintiffs therefore request declaratory and injunctive relief pursuant to the Administrative Procedure Act ("APA"). (ECF No. 1.) On June 30, 2017, Defendants lodged the administrative record with the Court. (ECF No. 18.) Plaintiffs subsequently moved to supplement the administrative record on August 24, 2017. (ECF No. 22.) Specifically, Plaintiffs seek supplementation of the record to include the following:

   1) The Declaration of Susan F. Hurst attesting to the chain of title

> through the certified deeds that trace the title to the subject property from statehood in 1850 to the transfer to the federal government in 2013; these deeds are part of the official records of Yuba County;
>
> 2) Two Records of Decision (RODs), both issued by [D]efendants, with respect to the [Yuba parcel]:
>
>    a) The ROD issued in September 2011 as to the so-called "2719 Determination" that the [Yuba] parcel can be taken into trust for possible future use as a casino gaming site under [IGRA] [(the 2011 IGRA ROD)]; and
>
>    b) The ROD issued in November 2012 as to the decision to take the land into trust [pursuant to IRA] [(the 2012 IRA ROD)].

(ECF No. 22 at 3.)

### III. STANDARD OF LAW

Judicial review of an agency action is generally limited to review of the record on which the administrative decision was based. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971); *Animal Def. Council v. Hodel*, 840 F.2d 1432, 1436 (9th Cir. 1988), *amended*, 867 F.2d 1244 (9th Cir. 1989). With respect to determining the adequacy of an administrative record in the APA context, the scope of judicial review is limited to "the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). It is the agency's responsibility to compile the administrative record and present it to the court. *See Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985) ("The task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court."). However, the administrative record is "not necessarily those documents that the *agency* has compiled and submitted as 'the' administrative record." *Thompson v. U.S. Dept. of Labor*, 885 F.2d 551, 555 (9th Cir. 1989) (emphasis in original) (internal citation omitted). Rather, the whole administrative record "consists of all documents and materials directly or *indirectly* considered by agency decision-makers and includes evidence contrary to the agency's position." *Id.*

That said, the record need not include "every scrap of paper that could or might have been

created" on a subject. *San Luis & Delta-Mendota Water Auth. v. Jewell*, No. 1:15-CV-01290-LJO-GSA, 2016 WL 3543203, at *2 (E.D. Cal. June 23, 2016) (quoting *TOMAC v. Norton*, 193 F. Supp. 2d 182, 195 (D.D.C. 2002)).

> A broad application of the phrase "before the agency" would undermine the value of judicial review: Interpreting the word "before" so broadly as to encompass any potentially relevant document existing within the agency or in the hands of a third party would render judicial review meaningless. Thus, to ensure fair review of an agency decision, a reviewing court should have before it neither more nor less information than did the agency when it made its decision.

*San Luis & Delta-Mendota Water Auth.*, 2016 WL 3543203, at *2 (quoting *Pac. Shores Subdivision v. U.S. Army Corps of Eng'rs*, 448 F. Supp. 2d 1, 5 (D.D.C. 2006)).

"An agency's designation and certification of the administrative record is entitled to a 'presumption of administrative regularity.'" *Nat. Res. Def. Council v. Zinke*, No. 1:05-cv-01207-LJO-EPG, 2017 WL 3705108, at *3 (E.D. Cal. Aug. 28, 2017) (citing *McCrary v. Gutierrez*, 495 F. Supp. 2d 1038, 1041 (N.D. Cal. 2007)). As such, courts are required to presume that "the agency properly defined and compiled the administrative record absent 'concrete evidence' that the agency omitted documents or materials that it actually considered when making its decision." *Conservation Cong. v. United States Forest Serv.*, No. 2:13-cv-01922-TLN-CMK, 2016 WL 10637090, at *2 (E.D. Cal. Oct. 12, 2016) (citing *Pinnacle Armor, Inc. v. United States*, 923 F. Supp. 2d 1226, 1239 (E.D. Cal. 2013)).

The party seeking to supplement the record bears the burden of overcoming this presumption by producing concrete evidence demonstrating any of the following exceptions: "(1) if admission [of supplemental evidence] is necessary to determine whether the agency has considered all relevant factors and has explained its decision[;] (2) if the agency has relied on documents not in the record[;] (3) when supplementing the record is necessary to explain technical terms or complex subject matter[;] or (4) when plaintiffs make a showing of agency bad faith." *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005) (citing *Southwest Ctr. for Biological Diversity v. United States Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996)).

///

### IV. ANALYSIS

Plaintiffs request supplementation of the administrative record to show that Defendants failed to properly consider whether the Tribe exercised territorial jurisdiction as required by IGRA and therefore exceeded their statutory authority in issuing the Secretarial Procedures. (ECF No. 22 at 3–4.)

Plaintiffs argue that despite Defendants' obligation to analyze "how territorial jurisdiction transfers from a state to the federal government and/or an Indian tribe," Defendants neglected to do so before issuing the Secretarial Procedures allowing the Tribe to engage in Class III gaming on the Yuba parcel. (ECF No. 24 at 2.) Instead, Plaintiffs claim Defendants issued the Secretarial Procedures "based on the common, but erroneous, belief that when land is taken into trust for an Indian tribe, jurisdiction somehow automatically shifts from the state to the tribe." (ECF No. 22 at 6.) According to Plaintiffs, there are limited ways in which the federal government can obtain territorial jurisdiction over lands within a sovereign state:

> 1) By a reservation of such jurisdiction when admitting the state into the Union;
>
> 2) By obtaining state consent to exclusive federal jurisdiction pursuant to the Enclaves Clause of the United States Constitution (U.S. Const., Art[.] 1, § 8, cl. 17); and
>
> 3) By obtaining a formal cession of some or all of the state's jurisdiction.

(ECF No. 1 at 14.) Plaintiffs argue that without a formal cession by the State of California or a formal acceptance of jurisdiction by the federal government, there is a conclusive presumption that jurisdiction never shifted from the state to the federal government. (ECF No. 22 at 6.) Based on the trust status of the Yuba parcel, Plaintiffs acknowledge the title transfer to Defendants in 2013. (ECF No. 24 at 4). However, Plaintiffs insist that the trust acquisition *only* affected title — not jurisdiction, which "has continuously rested with [the State] ever since 1850 and has never been relinquished[.]" (ECF No. 22 at 6.)

As such, Plaintiffs argue: (1) extra-record supplementation is required in order to determine whether Defendants considered the jurisdiction factor when making their decision; (2) the current administrative record does not reflect a consideration of the jurisdiction factor; and (3)

the proposed materials are highly relevant to the jurisdiction factor. (ECF No. 22 at 5–8.)

Defendants do not dispute that they did not examine the title history of the Yuba parcel. Instead, Defendants argue the federal government's ability to acquire land in trust for an Indian tribe necessarily has jurisdictional implications. (ECF No. 23 at 8.) Therefore, because the administrative record includes the Secretarial Procedures which documents the trust status of the Yuba parcel, Defendants claim "[n]othing more is necessary." (ECF No. 23 at 8.) Defendants argue Plaintiffs have not established by "clear evidence" that any exceptions to the general rule apply. (ECF No. 23 at 9.)

A. Indian Jurisdiction Over Land

"Indian tribes are domestic dependent nations that exercise inherent sovereign authority." *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2030 (2014) (internal quotations and citation omitted); *see also McClanahan v. State Tax Commission of Arizona*, 411 U.S. 164, 172 (1973) ("The Indian sovereignty doctrine . . . provides a backdrop against which the applicable treaties and federal statutes must be read."). "As a result of that sovereignty and federal plenary authority over governing Indian tribes, 'primary jurisdiction over land that is Indian country rests with the Federal Government and the Indian tribe inhabiting it, and not with the States.'" *Club One Casino, Inc.*, 2017 WL 5877033, at *5 (citing *Alaska v. Native Village of Venetie Tribal Government*, 522 U.S. 520, 527 n.1 (1998)). Furthermore, "[l]and taken into trust by the United States for the benefit of an Indian tribe is Indian country." *Id.* (citing *Oklahoma Tax Comm'n v. Citizen Band of Potawatomi Indian Tribe of Oklahoma*, 489 U.S. 505, 511 (1991)). Therefore, "[w]hen the federal government takes land into trust for an Indian tribe, the state that previously exercised jurisdiction over the land cedes *some* of its authority to the federal and tribal governments." *Id.* (citing *Upstate Citizens for Equality, Inc. v. United States*, 841 F.3d 556, 569 (2d Cir. 2016)). Courts have held that such a "transfer of jurisdiction from a State to the Federal Government and an Indian tribe does not require consent by a state." *Id.* (citing *Nevada v. Hicks*, 533 U.S. 353, 365 (2001)).

Here, the parties do not dispute that the Yuba parcel was taken into trust for the Tribe on May 16, 2013, nor do they dispute that the federal government may acquire land and place it in

trust for an Indian tribe. (ECF No. 24 at 2.) While is it true that "the Secretary's act of taking land into trust for an Indian tribe does not wholly divest the state of jurisdiction over the land," courts have made it clear that the trust status of the Yuba parcel implies the federal government and the Tribe exercise at least some jurisdiction over the land. *Club One Casino, Inc.*, 2017 WL 5877033, at *5–6. Though this jurisdiction is not exclusive, there is no specific requirement under IGRA that a tribe exercises exclusive jurisdiction over the land in question. *Id.* at 6. The Court declines to delineate the specific contours of the concurrent jurisdiction shared by the State, the federal government, and the Tribe, except to re-affirm that "when the Secretary of the Interior takes land into trust for an Indian tribe, [the tribe] certainly has jurisdiction over that land for the purposes of IGRA." *Id.*

B. The Administrative Record Reflects a Proper Consideration of the Jurisdiction Factor by Defendants

The fact that the Yuba parcel has been held in trust by the federal government for the Tribe satisfies the jurisdiction requirement under IGRA. Therefore, Defendants were not obligated to review any materials beyond those pertaining to this trust status, such as the title history of the land. The administrative record, as it is currently lodged, adequately reflects the trust status of the Yuba parcel. Because Plaintiffs have failed to rebut the strong presumption of regularity that Defendants properly compiled the administrative record, the Court finds supplementation is not appropriate here.

**IV. CONCLUSION**

For the foregoing reasons, the Court hereby DENIES Defendants' Motion to Supplement the Administrative Record. (ECF No. 22.)

IT IS SO ORDERED.

Dated: March 1, 2019

Troy L. Nunley
United States District Judge

9